**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   **CV 21-2957JFW(MARx)**                        Date:  March 28, 2022

Title:        M.A.R., et al. *-v-* City of Los Angeles, et al.

---

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   **Shannon Reilly**                            **None Present**
   **Courtroom Deputy**                        **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**      **ATTORNEYS PRESENT FOR DEFENDANTS:**
                None                                            None

**PROCEEDINGS (IN CHAMBERS):**      **ORDER GRANTING IN PART AND DENYING IN PART**
                                                    **DEFENDANTS OFFICER BRETT BECKSTROM,**
                                                    **OFFICER ANGEL ROMERO, OFFICER MICHAEL**
                                                    **LOPEZ AND OFFICER TYLER MOSER'S MOTION FOR**
                                                    **SUMMARY JUDGMENT, OR IN THE ALTERNATIVE**
                                                    **FOR PARTIAL SUMMARY JUDGMENT [filed 1/17/22;**
                                                    **Docket No. 64]**


        On January 17, 2022, Defendants Officer Brett Beckstrom ("Beckstrom"), Officer Angel Romero ("Romero"), Officer Michael Lopez ("Lopez"), and Officer Tyler Moser ("Moser") (collectively, the "Individual Officers") filed a  Motion for Summary Judgment, or in the Alternative for Partial Summary Judgment ("Motion").[1]  On January 31, 2022, Plaintiffs M.A.R., a minor, by and through his Guardian ad litem Elisabeth Barragan, ("M.A.R.") and Silvia Imelda Rivera ("Rivera") (collectively, "Plaintiffs") filed their Opposition.  On February 7, 2022, the Individual Officers filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's February 28, 2022 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

---

        [1]  On January 17, 2022, Defendant Nathan Ramos ("Ramos") filed a Joinder in the Individual Officers' Motion.  However, on February 10, 2022, Plaintiffs filed a Stipulation of Dismissal, dismissing Ramos with prejudice from this action.

Initials of Deputy Clerk  _sr_

I.     **Factual and Procedural Background**[2]

A.     **Factual Background**

This action arises out of the August 14, 2020 arrest of Daniel Rivera ("Decedent"), who was suspected of attempted residential burglaries.  M.A.R. is Decedent's minor child and Rivera is Decedent's mother.

On August 14, 2020, Los Angeles Police Department ("LAPD") officers were dispatched to the 13500 block of Wingo Street in Arleta, California after multiple 911 calls from citizens who reported that a male suspect wearing a white shirt and dark pants, who was later identified as Decedent, was attempting to forcibly enter several residences.  Residents in the area observed Decedent banging on doors and windows during his attempts to enter several homes.  Other residents observed Decedent remove a window screen from a front window and vandalize property at a residence.  During subsequent interviews, residents stated that Decedent appeared to be under the influence of drugs or alcohol and seemed confused.

The first unit to respond to the scene was an air unit.  Once on the scene, the Flight Officer observed Decedent in the rear yard of a residence.  Decedent then proceeded east and jumped over a fence to the neighboring property and then headed south on Wingo Street.  According to the Flight Officer, Decedent stumbled as he ran down the street before falling to his knees and began crawling.  Decedent then got to his feet, leaned against a parked vehicle, and appeared to rest. Decedent continued to stumble as he ran toward the east end of the street.

The Flight Officer believed Decedent was intoxicated and advised the responding patrol units of Decedent's location.  The Flight Officer then observed Decedent knock on the front door of a house and pull on the doorknob.  The Flight Officer advised the responding patrol units that it appeared that Decedent was trying to enter the house.  Indeed, according to one resident, Decedent attempted to enter her house and that attempt was recorded on her "Ring" video doorbell.  The resident had her front door open and Decedent attempted to enter her house by pulling on the metal security screen door, but was prevented from entering the house because the screen door was locked.

As the officers in the patrol units arrived on the scene, they observed Decedent walk from the front of a residence on the south side of the street at the end of the cul-de-sac and approach a chain link fence leading to the wash.  One of the officers repeatedly instructed Decedent to get on the ground.  Decedent momentarily faced the officers then turned and began to climb the chain-linked fence leading to the wash.  Decedent grabbed the top of the fence and lifted himself over, appearing to drag his chest and abdomen across the top of the fence before falling to the ground on the opposite side.  Decedent then stood up and walked down the embankment of the wash. The officers then walked towards the fence line.  As they approached the fence line, they observed

_____

[2]  To the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

Initials of Deputy Clerk __sr__

Decedent lying partially on his left side, face down at the bottom of the embankment, with his back facing south and his hands partially out of view.  The air unit was still on scene and the Flight Officer reported that she had observed Decedent "roll down" the embankment and lie motionless at the bottom.  Because she believed that Decedent may be injured, the Flight Officer requested an LAFD Rescue Ambulance ("RA") to respond to the scene.  Beckstrom and Moser climbed over the fence and observed Decedent from the top of the wash.  Romero, Lopez, and Ramos also responded to the call and arrived on the overpass to the wash, which was approximately 450 feet away from Decedent's location.  After Romero, Lopez, and Ramos entered the wash, Romero and Lopez ran south along the top of the west embankment toward Beckstrom's and Moser's location while Ramos walked along the top of the east embankment.

Due to the nature of the radio call, the Individual Officers believed that Decedent may be armed with a weapon or carrying burglary tools that could be used as weapons.  Once the Individual Officers were assembled at the top of the wash, one of the Individual Officers yelled at Decedent to show his hands.  Decedent did not respond or otherwise react to that command.  Beckstrom formed an arrest team and a tactical plan.  Beckstrom designated Moser to be the communications officer. Beckstrom designated Lopez to be the less lethal force officer and Lopez was given a beanbag shotgun.  Beckstrom designated himself and Romero to be the officers who would go "hands on" with Decedent, which involved handcuffing Decedent and taking him into custody.

While other officers provided cover with a shotgun from the top of the wash, the Individual Officers descended the embankment south of Decedent.  Once the Individual Officers reached the bottom of the embankment, they stepped east into the center of the wet wash and faced Decedent. Although the Individual Officers could see Decedent's right hand, they could not see his left hand. The Individual Officers then instructed Decedent in English to lay on his stomach and in Spanish to show his hands and place his hands out to his sides.  Decedent did not respond to any of the commands.

The Individual Officers then approached Decedent, who was still lying partially on his left side, face down at the edge of the wash.[3]  Romero and Beckstrom approached Decedent together, with Beckstrom instructing Decedent in Spanish not to move.  Beckstrom immediately pressed his left hand on the back of Decedent's right shoulder while simultaneously grabbing Decedent's right wrist with his right hand and instructed Decedent to "give me your hand."  Beckstrom also placed his left knee on Decedent's lower back to prevent Decent, who was still lying partially on his left side, from turning over.  Simultaneously, Romero grabbed Decedent's left wrist and forearm with both hands and placed his right knee on the left side of Decedent's back.  Decedent, who had previously had his eyes closed, immediately tensed up his body and opened his eyes, looked upward to his right, and immediately placed his hands behind his head to prevent being handcuffed as he moved into a prone position.  According to Beckstrom, Decedent "immediately tensed up and

---

[3]  It took approximately two minutes and four seconds from the time Beckstrom and Romero went "hands on" with Decedent until he was handcuffed and approximately another one minute and four second before Decedent's legs were secured with a hobble restraint.  This process involved simultaneous actions by each of the Individual Officers and, to the extent possible, those actions will be described in chronological order.

Initials of Deputy Clerk  _sr_

began trying to buck us off and roll. So we struggled with his – struggled to maintain control of his arms." As the struggle continued, Beckstrom told Decedent to calm down. Instead, Decedent began grunting and gripping his hands together behind his head, shifting his midsection from left to right, and attempting to lift his body upward.

While maintaining his grasp of Decedent's left arm, Romero removed his handcuffs with his right hand and was able to apply a single cuff to Decedent's left wrist. Decedent then clenched his hands together behind his head and placed his left thumb through the open cuff. At this point, Moser unholstered his TASER and warned Decedent that "if you start fighting, you are going to get tased dude." At the same time, Romero realized that it was going to be very difficult to handcuff Decedent using one set of handcuffs and requested a second set.

Immediately after Romero and Beckstrom made contact with Decedent, Lopez observed Decedent "tensing up his arms," "getting really rigid," and beginning "to wiggle around and squirm." As a result, Lopez repositioned the beanbag shotgun behind his back and knelt next to Decedent's head. Lopez momentarily grabbed Decedent's left wrist, retrieved his handcuffs with his right hand, and attached one end to the initial unsecured cuff. Romero then grabbed the chain of the second set of handcuffs with his right hand and attempted to connect the unsecured cuff to Decedent's right wrist, which was still positioned behind his head. Beckstrom instructed Romero to first pull Decedent's right arm behind his back. While holding the chain of the unsecured handcuff with his right hand and gripping Decedent's right wrist with his left hand, Romero was able to momentarily pull Decedent's arms away form his head and moved them to a position in front of his body.

Decedent continued to struggle and clasp his hands together and grip the handcuffs to avoid being handcuffed. Lopez grabbed Decedent's right forearm with his right hand while simultaneously utilizing his left hand to grab Decedent's right arm above the elbow. Lopez attempted to separate Decedent's hands and pull Decedent's right arm behind his back. However, Decedent resisted by tensing up his arms and pulling his hands inward toward his head. Despite repeated commands from Lopez to release the handcuffs, Decedent refused to comply. Moser once again warned Decedent "you're going to get tased. Stop."

Despite the warning, Decedent continued to struggle and to grip the handcuffs by wrapping his fingers inside one of the two cuffs that had been joined together. As Romero grabbed Decedent's left wrist and attempted to pull it behind his back, Lopez placed his right knee on Decedent's right arm and then placed his knee between Decedent's right bicep and right cheek in order to pull Decedent's arm behind his back. A few second later, Decedent lifted his head up toward Lopez, who then placed his right hand on the back of Decedent's head and held it down toward the ground for approximately four seconds in order to gain control and prevent Decedent's movement.

Decedent continued to raise his hips and "buck" his body upward and turn his head to the side. Beckstrom was concerned that Decedent might attempt to bite one of the officers, so he placed his hands on the back of Decedent's neck and applied downward pressure to prevent Decedent from turning and lifting his head for approximately one minute and nine seconds. Beckstrom did not believe his actions in any way restricted the airway of Decedent.

Initials of Deputy Clerk _sr_

Simultaneously, Lopez repositioned himself along Decedent's right side.  As Lopez used his right hand to grab Decedent's right forearm and his left hand to grab Decedent's right wrist, Romero was on the opposite side of Decedent and he used his left hand to apply a firm grip to Decedent's left wrist.  Lopez and Romero were able to briefly separate Decedent's hands at this point.  However, as they attempted to pull his arms behind his back, Decedent resisted and tried to pull them back toward his head and eluded the Individual Officers' attempt to place him in handcuffs.

At this point, Moser was concerned that Decedent's continued struggling, which included raising his hips of the ground and attempting to pull his arms away from officers would result in injuries to the officers due to the hard, wet surface of the wash and Decedent's continued refusal to obey the officers commands, including commands to release his grip on the handcuffs.  Specifically, Moser stated that his "concern was that because [of] where the suspect was laying towards the slope, with him bucking around and being in the wash, their footing wasn't as good and you would slip and slide around everywhere.  That if he bucked one of the officers, who had, you know, one foot on the ground or on their knees, that they're going to fall and hit their head onto the slope of the rock or the rocking or the cement base of the slope."  As a result of Moser's concerns, Decedent's consistent and aggressive resistance, and Moser's knowledge that Decedent's front waistband had not yet been checked for weapons, Moser placed his TASER against Decedent's left rear thigh and fired, causing both TASER probes to penetrate Decedent's thigh.  According to Moser, "I discharge a - - I did a probe mode to his upper left hamstring right underneath his glutes, let it cycle for the full five seconds.  I realized it didn't have any type of neuromuscular incapacitation against him."

Immediately after Moser's first TASER application, he noticed that Decedent continued to raise his hips as if trying to "buck" Beckstrom off of him.  Moser warned Decedent that he was going to deliver a second application of the TASER.  He then placed the contacts of the TASER cartridge against Decedent's left calf and delivered a three-point drive stun.  Although Moser believed that this second TASER application did have some neuromuscular incapacitation effect on Decedent, he observed that the officers were still unable to pull Decedent's hands behind his back.  According to Moser, Decedent "was still bucking.  This time it looked like my partner was actually on his lower back, which still alerted me even more because now [Decedent] is physically lifting my partner off the ground, it appeared."

Moser then observed Decedent continue to pull his left hand toward his body as Romero attempted to pull his hand behind his back.  Moser delivered a second three point drive stun (and third overall TASER application) to Decedent's left calf approximately fourteen seconds after the first three point drive stun.  Decedent began kicking his legs towards Moser's hand and Beckstrom while simultaneously rocking his shoulders back and forth.  Decedent also continued to try to place his hands under his body and attempted to lift his hips to buck or move Beckstrom off of his back.  Moser then delivered a third three point drive stun (and fourth overall TASER application) to Decedent's left calf.  Because the TASER did not appear to be effective, Moser did not use it again.   Notwithstanding their efforts, the Individual Officers were unable to handcuff Decedent.

Nearly simultaneous with Moser's last TASER application, Beckstrom straddled Decedent's lower back with his knees on the ground next to Decedent's hips to keep Decedent from raising off the ground and to keep Beckstrom from sliding on the slippery surface of the wash.  While

straddling Decedent, Beckstrom placed "hip pressure" against Decedent's waist and placed his shins against the back of Decedent's legs.  Beckstrom also applied downward pressure to Decedent's upper back with his right forearm to "prevent him from rolling."  Immediately prior to Beckstrom straddling Decedent, Romero removed his right knee from Decedent's back and repositioned it on the ground next to Decedent.  Romero's right knee had been on Decedent's upper left back and shoulder area for approximately fifty-three seconds.  During that time period very little body weight was placed on Decedent because Romero's right foot remained on the ground.

During the time the officers were initially struggling to handcuff Decedent, Ramos was standing on the west side of the wash at the top of the embankment.  Ramos came down the embankment when he observed Decedent kicking at the Individual Officers and resisting the Individual Officers' attempts to place his arms behind his back.  Once Ramos reached the area where Decedent was struggling with the Individual Officers, Ramos walked behind Decedent and grabbed Decedent's ankles with both hands.

As Decedent continued to resist by stiffening his arms, Lopez applied a firm grip to Decedent's right wrist with his right hand and pulled it behind Decedent's back while another officer shouted "one arm is back, one arm is back."  Simultaneously, Romero grasped the unsecured handcuff with his left hand and Decedent's left forearm and wrist with his other hand, and he was able to eventually pull Decedent's left arm behind his back.  Once in that position, Beckstrom was able to grasp the chain of the second set of handcuffs and held the chain as Romero handcuffed Decedent's right wrist.  After a struggle involving four officers that lasted approximately two minutes, Decedent was finally handcuffed using a double set of handcuffs.  An officer broadcasted that Decedent was in custody and made a second request for an RA due to the use of the TASER.

Even after he was handcuffed, Decedent continued to buck his hips and lift his body.  In an effort to control Decedent's legs and prevent him from pulling them under his body, Beckstrom told Lopez to apply a hobble restraint on Decedent's ankles.  Lopez placed his left shin across Decedent's calves and applied the hobble on Decedent's ankles.  Once the hobble was secured, Beckstrom and Lopez no longer had to hold Decedent in a prone position.

Beckstrom and Romero immediately turned Decedent to his left side and held him by the right arm.  Decedent then attempted to force himself into a prone position by rolling his chest downward and his right hip forward.  While maintaining their grasp of Decedent's right arm, Beckstrom and Romero was finally able to conduct a search of Decedent's waistband and pockets.  No weapons or contraband was located.

Decedent continued to bend and lift his legs after being turned on his left side.  Lopez placed his left knee on Decedent's ankles to prevent Decedent from moving.  Decedent remained on his left side for approximately fifty-two seconds.

While standing on Decedent's left side, Romero applied a firm grip to Decedent's right wrist to prevent him from rolling from his left side on to his stomach.  Decedent continued to move his hips and twist his body away from Romero, and was able to turn, and ended up in a semi-prone position with his right hip raised from the ground and his left hand under his midsection.  Decedent

made repeated grunting noises and made religious references in Spanish when officers asked his name.  Romero released his grip of Decedent's right hand and repeatedly told Decedent to calm down.  Decedent continued to thrust his hips upward while making grunting sounds.  According to Romero, he was unable to roll Decedent back on his left side due to Decedent's resistance, the wet and slippery conditions of the wash, and Romero's own fatigue.  According to Beckstrom, Decedent could not be placed back on his left side because Decedent repeatedly tried to roll onto his stomach.  In addition, Beckstrom noted that once Decedent was on his stomach, Decedent seemed to calm down.

Decedent remained face down for approximately two minutes and thirty-five seconds.  During this time, Beckstrom and Romero stood over Decedent and maintained contact by placing their hands on Decedent's arm and back.  According to Beckstrom, he "just used palm pressure on [Decedent's] shoulder to try to prevent him from rolling."  According to Romero, he was not using any force at this point and merely had his hand on Decedent because he "was afraid of [Decedent] just regaining that like fighting mode.  So I just wanted to keep a hand, so I could easily just try to use the floor as a controlling agent, so that's why my hand was placed there.  I didn't want to just stand up and let him be right there."  During this same time period, Lopez held the end of the hobble in his right hand while placing his left hand on Decedent's ankles because he "didn't want [Decedent] to wiggle out of the hobble."

As Decedent began to calm down, Beckstrom moved to Decedent's right side and squatted down.  Beckstrom placed his right knee on the back of Decedent's right shoulder for approximately ten seconds.  According to Beckstrom, he "lightly" rested his knee on Decedent's shoulder to provide a barrier in the event that Decedent attempted to roll again, but he never placed his full body weight on Decedent.

At approximately this same time, two Sergeants arrived at the scene and observed Decedent lying face down at the bottom of the wash with officers standing nearby monitoring him.  One of the Sergeants immediately instructed the officers to place Decedent on his side in a recovery position.  Moser advised the Sergeant that Decedent "is rolling.  He is rolling.  He won't stay on his side."  The other Sergeant then suggested that the officers position one of Decedent's legs out to the side.  The officers then informed the Sergeants that Decedent's legs were hobbled.

Immediately following the Sergeant's instruction, Romero rolled Decedent back onto his left side and held him in that position.  Decedent remained on his left side for approximately three minutes and eleven seconds as the officers continued to monitor him and wait for the arrival of the RA.  During this time period, Decedent was breathing but was unresponsive to the officers' attempts to communicate with him.  Lopez rubbed Decedent's chest to obtain a response, with no response from Decedent.  Several minutes later, Romero also tried to "stimulate" Decedent by rubbing his chest with no response from Decedent.

Beckstrom suggested that the officers replace Decedent's double set of handcuffs with a single set.  According to Beckstrom, he believed that a single set of handcuffs would give the officers better control of Decedent now that he was in custody.  As Beckstrom and Romero were in the process of switching out the handcuffs, Beckstrom told the officers that once the re-handcuffing was completed, they would place Decedent on his right side.  After the re-handcuffing was completed, Beckstrom and Lopez turned Decedent onto his right side and held him in that position

Initials of Deputy Clerk  _sr_

for approximately four minutes while they continued to monitor him and wait for the arrival of the RA.

Moser requested dispatch to confirm that rescue personnel were responding to their location. While waiting for the RA, the officers noticed that Decedent's condition started to deteriorate and noted that Decedent appeared to be unconscious and was experiencing labored breathing. At approximately 6:26 p.m., one of the officers initiated a follow up call to dispatch and stated "advise RA that the suspect is losing consciousness. Having trouble breathing at this point."

Shortly thereafter, the RA arrived and LAFD Firefighter/Paramedics walked down the embankment to where Decedent was located in the wash. The Firefighter/Paramedics began their initial examination and assessment of Decedent. Decedent was breathing and responsive, was able to track the Firefighter/Paramedics with his eyes, and Decedent refused to provide any information to the Firefighter/Paramedics. Other LAFD personnel arrived at the scene and they discussed options for evacuating Decedent from the wash. Before they could move Decedent, the Firefighter/Paramedic treating Decedent determined that Decedent was in cardiac arrest and placed him to a supine position. Two of the officers removed the hobble from Decedent's ankles and two Firefighter/Paramedics began CPR. At the time they began CPR, the Firefighter/Paramedics had been on the scene for over eight minutes and thirty seconds and Decedent had not shown any signs of distress. A few seconds later, Beckstrom removed Decedent's handcuffs. Other Firefighter/Paramedics began assisting in the efforts to resuscitate Decedent. Unfortunately, Decedent failed to respond to those efforts, and he was pronounced dead at the scene.

On November 11, 2020, the County of Los Angeles Department of Medical Examiner-Coroner issued an Autopsy Report with respect to the autopsy performed by Dr. Brice L. Hunt ("Hunt"), Deputy Medical Examiner, on August 18, 2020. Hunt concluded that the cause of Decedent's death was "cardiopulmonary arrest following prone physical restraint with electromuscular disruption and methamphetamine intoxication." Hunt also concluded that "[h]ypertrophic cardiovascular disease is considered a contributory finding because enlarged hearts may increase the risk of cardiac arrhythmias." Finally, Hunt concluded that "[t]he manner of death is homicide due to human involvement regardless of the intent of any individual's actions."

On July 20, 2021, the Los Angeles Board of Police Commissioners ("LABOPC") issued its Abridged Summary of Categorical Use of Force Incident and Findings by the Los Angeles Board of Police Commissioners ("Findings"). The LABOPC found that the controlling force used by the Individual Officers to handcuff Decedent and take him into custody to be In Policy. The LABOPC found that Moser's use of the TASER to be Out of Policy.[4] Specifically, the LABOPC concluded that:

In reaching its adjudication of [Moser's] use of less-lethal force, the BOPC took note

---

[4] Although the LABOPC found Moser's use of the TASER to be Out of Policy, Chief Moore initially found Moser's use of the TASER to be In Policy. However, Chief Moore later adopted the LABOPC's conclusion that it was Out of Policy.

Initials of Deputy Clerk _sr_

of Department policy authorizing such force only when an officer reasonably believes that a subject is violently resisting arrest or poses an immediate threat of violence or physical harm.  The BOPC recognized that [Decedent] in this instance displayed a high level of resistence by utilizing his strength to prevent the officers from handcuffing him and by refusing to submit to an arrest.  However, in the BOPC's review of the available evidence, they noted that [Decedent's] resistance to being arrested was not violent and did not pose an immediate threat of violence or physical harm to the arresting officers.

The LABOPC also found that by allowing Decedent to remain in a prone position for two minutes and thirty-five seconds after Decedent voluntarily rolled from his left side onto his stomach, the Individual Officers were Out of Policy and noted that there was "a substantial deviation, without justification, from approved Department tactical training."  The LABOPC commented that it "would have preferred that [the Individual Officers] had recognized the necessity to maintain [Decedent] in a left or right lateral recumbent position, or a seated position if possible, and utilized the appropriate and minimal amount of force to do so.

### B.    Procedural Background

On September 9, 2021, Plaintiffs filed a First Amended Complaint ("FAC") against the Individual Officers, Ramos, the City of Los Angeles (the "City"), and LAPD Chief Michael Moore, individually and in his official capacity ("Chief Moore")[5], alleging causes of action for: (1) unreasonable search and seizure – excessive force in violation of Decedent's Fourth Amendment rights pursuant to 42 U.S.C. § 1983 (alleged by Plaintiffs against the Individual Officers and Ramos); (2) deprivation of life without due process in violation of the Substantive Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (alleged by Plaintiffs against all the Defendants); (3) municipal liability for unconstitutional custom or policy pursuant to 42 U.S.C. § 1983 (alleged by Plaintiffs against the City and Chief Moore); (4) interference with parent-child relationship in violation of Rivera's Fourteenth Amendment right to a familial relationship pursuant to 42 U.S.C. § 1983 (alleged by Rivera against all Defendants); (5) wrongful death pursuant to California Code of Civil Procedure § 377.60 (alleged by M.A.R. against the Individual Officers and Ramos); (6) assault and battery (alleged by M.A.R. against the Individual Officers and Ramos); (7) negligence (alleged by M.A.R. against the Individual Officers, Ramos, and the City); and (8) violation of the Bane Act, California Civil Code § 52.1 (alleged by M.A.R. against all the Defendants).  In their FAC, Plaintiffs allege that the Decedent was killed by the Individual Officers and Ramos on August 14, 2020 by their reckless use of excessive force despite the fact that Decedent "was unarmed, surrendering and was not threating [*sic*] anyone."  FAC, ¶ 1.  Plaintiff allege that the excessive force used by the Individual Officers and Ramos took the form of "piling on top of [Decedent] while he was in a prone position, tasing [Decedent] four (4) times without justification, [and] improperly restraining him while applying full body weight and forcing him in face own [*sic*] while in medical distress causing positional asphyxiation."  *Id.*

---

[5]   The Individual Officers, Ramos, the City, and Chief Moore will be referred to collectively as "Defendants."

Initials of Deputy Clerk   sr

## II.      Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial.  *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party."[6] *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.     Discussion

In their Motion, the Individual Officers argue that they are entitled to qualified immunity on Plaintiffs' first, second, and fourth causes of action, which are brought pursuant to Section 1983, because the Individual Officers did not violate Decedent's or Plaintiffs' constitutional rights and because Plaintiffs cannot demonstrate that the law was clearly established such that a reasonable

---

[6]  In addition, although "video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage" *(Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018)), a district court does not err by "view[ing] the facts in the light depicted by the video" to the extent the plaintiffs' version of the incident is blatantly contradicted by the video.  *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also A.G., 1-4 v. City of Fresno*, 804 Fed. Appx. 701 (9th Cir. 2020).

Initials of Deputy Clerk  sr

officer in the Individual Officers' positions could have concluded that the Individual Officers' conduct was unlawful.[7]  In addition, the Individual Officers argue that they are entitled to summary judgment on Plaintiffs' state law claims.[8]  In their Opposition, Plaintiffs argue that the Individual Officers are not entitled to summary judgment on any of Plaintiffs' claims because they violated the United States Constitution and California state law when they used unreasonable force to detain Decedent, resulting in his death.

### A.    The Legal Standard for Section 1983 Claims

Plaintiffs allege violations of Section 1983.  It is well established that Section 1983 itself

_____

[7]  In the first cause of action, Plaintiffs have brought a Section 1983 claim based on the violation of Decedent's Fourth Amendment right to be free of excessive force.  In the second cause of action, Plaintiffs, as the son and mother of Decedent, bring a Section 1983 claim based on the violation of Plaintiffs' Fourteenth Amendment rights to a familial relationship with Decedent.  In the fourth cause of action, Rivera, as the mother of Decedent, has brought a Section 1983 claim based on the violation of her Fourteenth Amendment right to a familial relationship with Decedent.  Rivera brings the fourth cause of action "as successor-in-interest to [Decedent] and seeks both survival and wrongful death damages under federal law for the violation of [Decedent's] rights."  FAC, ¶ 94.  Although Rivera may bring a claim pursuant to the Fourteenth Amendment Due Process Clause arising out of her loss of Decedent's companionship and support (as she has in the second cause of action), she may not allege a "wrongful death" claim under Section 1983 based on a violation of Decedent's Fourth Amendment rights.  *See, e.g., Neuroth v. Mendocino Cty.*, 2016 WL 379806, at *4 (N.D. Cal. Jan. 29, 2016) ("Plaintiff's Fourth and Fourteenth Amendment claims are his § 1983 survival actions, which are separate from any wrongful death claims brought pursuant to state law.  This is because there is no 'wrongful death' claim under § 1983"); *Murphy v. Cty. of Mendocino*, 2016 WL 794458, at *2 (N.D. Cal. Mar. 1, 2016) ("To be clear, there is no 'wrongful death' claim under § 1983"); *Estate of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1159 (S.D. Cal. 2015) ("These cases confirm that Lopez's estate may bring a survivor action under § 1983 to vindicate his right to be free from excessive force under the Fourth Amendment. They do not stand for the proposition that his heirs may pursue a separate, federal cause of action for wrongful death under § 1983").

[8]  In the interests of "economy, convenience, fairness, and comity," the Court may decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.  Retaining the state law claims would require "the expenditure of substantial additional judicial time and effort."  *See Exec. Software N. Am., Inc. v. U.S. Dist. Ct. for the Cent. Dist. of Cal.*, 24 F.3d 1545, 1555-56 (9th Cir. 1994), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp* ., 533 F.3d 1087 (9th Cir. 2008). Moreover, "[n]eedless decisions of state law should be avoided as both a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Therefore, the Court **SEVERS** Plaintiffs' state law claims alleged in the fifth cause of action for wrongful death, the sixth cause of action for assault and battery, the seventh cause of action for negligence, and the eighth cause of action for violation of the Bane Act.  The Individual Officers' Motion is **DENIED without prejudice** with respect to those state law claims.  The Court will discuss the dismissal without prejudice or other disposition of the state law claims with the parties at the Pretrial Conference.

Initials of Deputy Clerk _sr_

creates no substantive rights, and that it merely provides a remedy for deprivation of federal rights established elsewhere.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  "The elements of a section 1983 action are: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Alford v. Haner*, 333 F.3d 972, 975-76 (9th Cir. 2003) (citation and internal quotation marks omitted).  With respect to the first element, it is undisputed that the Individual Officers were acting under color of state law.  With respect to the second element, Plaintiffs allege that the Individual Officers violated Decedent's Fourth Amendment rights and Plaintiff's Fourteenth Amendment rights to familial association by using excessive force on Decedent that resulted in his death.

## 1.     Legal Standard for Qualified Immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012) (holding that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law") (internal quotations omitted).  In *Saucier v. Katz*, the Supreme Court established a two-step sequence for determining whether qualified immunity attaches to specific circumstances.  *See Saucier v. Katz*, 533 U.S. 194 (2001).  First, the Court must determine based on the facts "[t]aken in the light most favorable to the party asserting the injury," whether "the officer's conduct violated a constitutional right."  *Id.* at 201.   Second, if the plaintiff satisfies this first step, the Court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct.  *Id.*

Although the determination of qualified immunity requires a two-step analysis, as the Ninth Circuit has held that "[t]hese two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense.  *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) (*citing Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 201.  This is an "objective but fact-specific inquiry." *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). "I[f] officers of reasonable competence could disagree on [the] issue, immunity should be recognized."  *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "It is the plaintiff who bears the burden of showing that the rights allegedly violated were 'clearly established.'"  *Shafer*, 868 F.3d 1110 (internal citation omitted).

## 2.     Whether a Right is Clearly Established is a Particularized Inquiry.

In the recent case of *City of Thalequah, Oklahoma v. Bond*, __ U.S. __, 142 S.Ct. 9 (2021), the Supreme Court once again made it clear that:

> The doctrine of qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231

Initials of Deputy Clerk  _sr_

(2009).  As we have explained, qualified immunity protects " 'all but the plainly
incompetent or those who knowingly violate the law.'"  *District of Columbia v. Wesby*,
583 U. S. ——, 138 S.Ct. 577, 589 (2018) (*quoting Malley v. Briggs*, 475 U.S. 335,
341 (1986)).

We have repeatedly told courts not to define clearly established law at too high a
level of generality.  *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  It is not
enough that a rule be suggested by then-existing precedent; the "rule's contours
must be so well defined that it is 'clear to a reasonable officer that his conduct was
unlawful in the situation he confronted.'"  *Wesby*, 583 U. S., at ——, 138 S.Ct., at
590 (*quoting Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  Such specificity is
"especially important in the Fourth Amendment context," where it is "sometimes
difficult for an officer to determine how the relevant legal doctrine, here excessive
force, will apply to the factual situation the officer confronts."  *Mullenix v. Luna*, 577
U.S. 7, 12 (2015) (*per curiam*) (internal quotation marks omitted).

*See also Rivas-Villegas v. Cortesluna*, __ U.S. __, 142 S.Ct. 4 (2021) (reversing the Ninth Circuit's
determination that the officer was not entitled to qualified immunity and holding that "[n]either
Cortesluna nor the Court of Appeals identified any Supreme Court case that addresses facts like
the ones at issue here.  Instead, the Court of Appeals relied solely on its precedent in *LaLonde*.
Even assuming that Circuit precedent can clearly establish law for purposes of § 1983, *LaLonde* is
materially distinguishable and thus does not govern the facts of this case").

Similarly, in the case of *City of Escondido, California v. Emmons*, 586 U.S. __, 139 S.Ct.
500, 503 (2019), the Supreme Court again emphasized that:

Under our cases, the clearly established right must be defined with specificity.  "This
Court has repeatedly told courts . . . not to define clearly established law at a high
level of generality."  *Kisela*, 584 U.S., at ___, 138 S.Ct., at 1152 (internal quotation
marks omitted).  That is particularly important in excessive force cases, as we have
explained:

> "Specificity is especially important in the Fourth Amendment context,
> where the Court has recognized that it is sometimes difficult for an
> officer to determine how the relevant legal doctrine, here excessive
> force, will apply to the factual situation the officer confronts.  Use of
> excessive force is an area of the law in which the result depends very
> much on the facts of each case, and thus police officers are entitled to
> qualified immunity unless existing precedent squarely governs the
> specific facts at issue . . .

> "[I]t does not suffice for a court simply to state that an officer may not
> use unreasonable and excessive force, deny qualified immunity, and
> then remit the case for a trial on the question of reasonableness.  An
> officer cannot be said to have violated a clearly established right unless
> the right's contours were sufficiently definite that any reasonable official
> in the defendant's shoes would have understood that he was violating

Initials of Deputy Clerk  sr

it." *Id.*, at ___, 138 S.Ct., at 1153 (quotation altered).

In addition, in the case of *White v. Pauly*, 580 U.S. ___, 137 S.Ct. 548, 552 (2017) (per curiam), the Supreme Court held that "it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" Moreover, the Supreme Court held that "[a]s this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." *Id.* Indeed, the Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted), but to consider "whether the violative nature of particular conduct is clearly established." *Id.* at 742; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (holding that the relevant inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition") (quotation marks omitted). Although the law "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) ("Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law") (quotation marks omitted); *Saucier,* 533 U.S. at 202 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate"); *see also Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (In performing the second step of the *Saucier* analysis, the Court must consider the "the reasonableness of the officer's belief in the *legality* of his actions. Even if his actions did violate the Fourth Amendment, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.").

In addition, the Ninth Circuit explained in *Sharp v. County of Orange*, 871 F.3d 901 (9th Cir. 2017), the importance of specificity in the Fourth Amendment context:

Except in the rare case of an "obvious" instance of constitutional misconduct (which is not presented here), Plaintiffs must "*identify a case* where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552 (2017) (per curiam) (emphasis added). In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies *in this case* that *their particular conduct* was unlawful. To achieve that kind of notice, the prior precedent must be "controlling" – from the Ninth Circuit or Supreme Court – or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Under the Fourth Amendment, police may use only such force in the course of detention or arrest as is objectively reasonable under the circumstances, and may use deadly force only in response to a threat of deadly force to either the police officer or to others. *See Graham v. Connor*, 490 U.S. 386, 394-395 (1989); *see, also Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (using standard set forth in *Graham* to affirm granting of summary judgment in Fourth Amendment deadly force case). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Id.* at 397.  This determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Determining whether a police officer's use of force was reasonable or excessive requires balancing the "nature and quality of the intrusion " on a person's individual liberty with the "countervailing governmental interests at stake." *Id.* at 396; *see also Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("'The essence of the *Graham* objective reasonableness analysis' is that '[t]he force which [i]s applied must be balanced against he need for that force: it is the need for force which is at the heart of the *Graham* factors.'") (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).  This includes balancing such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  The question is not whether other or lessor amounts of force could have been used, but only whether the force actually used was reasonable under the circumstances.  *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

## B.  Plaintiffs' Fourth Amendment Excessive Force Claim

In their FAC, Plaintiffs allege that the amount of "controlling force" used by Beckstrom, Ramos, and Lopez in order to handcuff Decedent and take him into custody constituted excessive force.[9]  Plaintiffs also allege that Moser's use of the TASER constituted excessive force.  In addition, Plaintiffs allege that the Individual Defendants used excessive force by allowing Decedent to voluntarily roll into and remain in a prone position after he was handcuffed.  In their Motion, the Individual Officers argue that they did not use excessive force and that the amount of controlling force used and the use of the TASER were necessary and reasonable in light of the totality of the circumstances the Individual Officers encountered at the time they attempted to handcuff Decedent and take him into custody.  The Individual Officers also argue that Decedent's conduct in voluntarily rolling into a prone position for ninety seconds does not constitute excessive force.  In addition, the Individual Officers argue that even if their actions violated Decedent's Fourth Amendment rights, the law was not clearly established and, as a result, the Individual Officers are

_____

[9]  Plaintiff argues that even if a particular Individual Officer was not personally involved in a purported use of excessive force, all of the Individual Officers are liable for that purported use of excessive force as integral participants by failing to stop the other Individual Officers from using excessive force.  A law enforcement officer deprives a plaintiff "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  As a result, a defendant's "liability under section 1983 is predicated on his integral participation in the alleged violation.  Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation.  But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal citations and quotations omitted).

Initials of Deputy Clerk __sr__

entitled to qualified immunity.

       **1.**      **The Individual Officers Are Entitled to Qualified Immunity With Respect
to Their Use of Controlling Force**

          **a.**      **The Individual Officers Did Not Violate Decedent's Fourth
Amendment Rights in Their Use of Controlling Force**

      In their Motion, the Individual Officers argue that controlling force used to handcuff
Decedent and take him into custody was necessary and reasonable in light of the "high level of
resistence [by Decedent] utilizing his strength to prevent the officers from handcuffing him and by
refusing to submit to an arrest."  In their Opposition, Plaintiffs argue, relying on *Drummond v. City
of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) and *Garlick v. County of Kern*, 167 F.Supp. 3d 1117
(E.D. Cal. 2016), that the controlling force used to handcuff Decedent and take him into custody
was a violation of Decedent's clearly established rights.  However, the case law relied on by
Plaintiffs is factually distinguishable and clearly inapplicable to this case.  In Plaintiffs' cases, the
decedents were placed in a prone position and had the body weight of one or more officers on their
backs for a prolonged period of time.  For example, in *Drummond v. City of Anaheim*, 343 F.3d
1052 (9th Cir. 2003), the decedent was chest/stomach down on the ground, handcuffed, with two
officers with their knees on the decedent's neck and back, applying their full body weight for
approximately twenty minutes even though the decedent had not resisted at any point during their
encounter, the decedent repeatedly told the officers he could not breathe, and that they were
choking him and independent witnesses observed him in respiratory distress.  Similarly, in *Garlick
v. County of Kern*, 167 F.Supp. 3d 1117 (E.D. Cal. 2016), the decedent was in a chest/stomach
down position, handcuffed, with four officers applying full body weight pressure to his back for
approximately eight to ten minutes while two hobbles were attached and the decedent was
hogtied.  After the decedent was hogtied and in a prone position, the officers twice picked him up
and dropped him face down on the ground.  *Id.* at 1155-56.

      The facts of this case are markedly different and readily distinguishable from those in
*Drummond* and *Garlick*.  As the body camera video clearly shows, and despite Plaintiffs's
argument to the contrary, Decedent actively resisted the Individual Officers during the entire
encounter.  Indeed, as soon as the first patrol unit arrived on the scene, Decedent refused to follow
the officers' commands to get on the ground and, instead, ran away, jumped a fence, and tried to
escape by laying down in the wash at the bottom of a steep embankment.  Once the Individual
Officers caught up with Decedent and attempted to handcuff him and take him into custody,
Decedent actively resisted them and continued to resist them even after he was handcuffed and
hobbled.  Although Plaintiffs argue without evidence that Decedent must have tensed up because
the Individual Officers "without warning pounced on the back and neck of [Decedent], while he lay
face down and grabbed his arms" (Opposition, 4:7-8), it is undisputed that Decedent was well
aware that the police were there to take him into custody.  Not only did Decedent flee from the
police when the first patrol unit arrived on the scene, Decedent ignored all of the commands, in
both English and Spanish, ordering Decedent to lay on his stomach, show his hands, and put his
hands out to the side.  Once the Individual Officers did go "hands on" with Decedent and attempted
to handcuff him, he forcefully and aggressively resisted the Individual Officers' efforts to handcuff
him for over two minutes by immediately tensing his body and moving his arms to a position that
prevented handcuffing him.  For example, although Plaintiffs argue that Decedent only

                                                        Initials of Deputy Clerk _sr_

"inadvertently" had his left fingers stuck inside the free cuff after the other cuff was applied to his left wrist, the body camera videos clearly shows that Decedent opened his fingers and grabbed and held onto the loose cuff with his left hand, maintained his grip, and then subsequently grabbed the left cuff with his right hand despite the Individual Officers repeatedly telling him to "let go" of the handcuffs.

In addition, while grabbing the handcuffs, Decedent also moved the rest of his body, attempting both to roll and buck, while pulling his arms away from the Individual Officers.  Indeed, Decedent's resistance was so violent that both Beckstrom's and Lopez's body cameras fell off during the struggle.  Decedent's continued resistence eventually required the Individual Officers to use two pairs of handcuffs in an attempt to secure Decedent.  Moreover, despite Plaintiffs' argument that the Individual Officers continued to place significant body weight on Decedent's back and neck even though he was not resisting, the body camera footage clearly demonstrates that Decedent continuously resisted the Individual Officers' efforts to take him into custody during the entire incident (including after he was handcuffed and hobbled) and that none of the Individual Officers ever had his full body weight on Decedent.  As the body camera footage clearly demonstrates, Decedent was continually moving his upper and lower body during the entire incident, and included his attempt to kick Beckstrom when Beckstrom straddled Decedent.  None of the Individual Officers ever placed their full body weight on Decedent and instead maintained the majority of their body weight over their own feet.  Indeed, even when Beckstrom straddled Decedent's hips in an attempt to prevent him from rolling, his body camera – which was on the ground at this point – clearly demonstrates that there was open gap between Decedent and Beckstrom with the majority of Beckstrom's weight on his knees, which were on ground on either side of Decedent, not on Decedent's back.  Furthermore, despite Plaintiffs' argument to the contrary, the body camera footage demonstrates that Decedent never showed any signs of respiratory distress throughout the approximately two minutes that Decedent resisted the Individual Officers.  To the contrary, Decedent was yelling various words and non sequiturs (such as "No!" and "Charlie, please don't!"), he never said that was unable to breathe, and although he was grunting from physical exertion throughout, he was not wheezing or gurgling and there were no other signs of distress.

In light of the nature of Decedent's resistence captured by the body camera videos when the Individual Officers attempted to handcuff him, the amount of force used by the Individual Officers amounted to nothing more than the controlling force necessary to physically direct Decedent's arms into a position to be handcuffed.  Indeed, "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (*citing Mayard v. Hopwood*, 105 F.3d 1226, 1227–28 (8th Cir. 1997)).  For example, in *Tatum v. City and County of San Francisco*, 441 F.3d 1090 (9th Cir. 2006), the decedent resisted handcuffing and four officers struggled with him physically before eventually placing him in handcuffs.  The Ninth Circuit held that the officers did not use excessive force in placing the decedent in a control hold and on his stomach for approximately ninety seconds.  *Id.*  Specifically, the Ninth Circuit concluded that:

> It was objectively reasonable for the officers to position [the decedent] on his stomach for approximately ninety seconds.  Officer Smith testified that [the decedent] kicked and struggled throughout the officers' efforts to secure him in handcuffs.  The officers needed to incapacitate [the decedent], both to protect themselves and to

Initials of Deputy Clerk  _sr_

protect him.  As the district court noted, the summary judgment record did not contain evidence that any officer applied crushing pressure to the decedent's] back or neck as he lay prone.

*Id*.

Similarly, in this case, it was not unreasonable for the Individual Officers to allow Decedent to remain on his stomach for approximately two minutes in light of Decedent's resistance of the Individual Officers' attempts to handcuff him and an additional one minute to hobble him as he continued to resist the Individual Officers' efforts to take him into custody.  Indeed, even the LABOPC found that the Individual Officers' use of controlling force was In Policy.  In addition, the Individual Officers did not know if Decedent was armed and they were unable to make that determination until he was in handcuffs and they were able to search him.  It is undisputed that at no point during this struggle did any of the Individual Officers threaten to use lethal force or kick or punch Decedent.  Instead, the Individual Officers simply used the amount of force necessary and reasonable in order to handcuff Decedent, who was actively resisting the Individual Officers' efforts to take him into custody.  Moreover, as soon as the Individual Officers were able to handcuff and hobble Decedent, the Individual Officers immediately placed Decedent on his left side, so he was no longer in a prone position.  In light of the undisputed facts of this case, the Court concludes that the Individual Officers' use of controlling force was objectively reasonable.  *See, e.g., Gregory v. County of Maui*, 523 F.3d 1103, 1109 (9th Cir. 2008) (affirming reasonableness of controlling force holding suspect to the ground while suspect was resisting).

Therefore, viewing the facts in the light most favorable to Plaintiffs, the Court concludes that the Individual Officers did not violate Decedent's Fourth Amendment rights with respect to the type and amount of controlling force used by the Individual Officers.  Accordingly, the Motion is granted with respect to Plaintiffs' first cause of action alleging a violation of Decedent's Fourth Amendment rights to the extent it is based on the use of controlling force.

### b.   The Individual Officers Did Not Violate Clearly Established Law With Their Use of Controlling Force

Because the Court concludes that Decedent's Fourth Amendment rights were not violated by the Individual Officers with respect to their use of controlling force, the Court need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even assuming that the Court had found that the Individual Officers' use of controlling force constituted a constitutional violation, the Individual Officers would still be entitled to summary judgment on Plaintiffs' claim that Decedent's Fourth Amendment rights were violated on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Individual Officers are entitled to qualified immunity because it was not clearly established that the Individual Officers use of controlling force under these particular circumstances would be a violation of Decedent's Fourth Amendment rights.  From the Individual Officers' perspective and knowledge of the situation, Decedent, who appeared to be under the influence of drugs or alcohol and had been attempting to break in to multiple residences and vandalizing property in the area, had refused to obey commands from officers throughout the entire encounter

Initials of Deputy Clerk  sr

with officers, including his initial refusal to comply with the officers' commands to get on the ground and his decision to run away from officers, jump a fence, and go down an embankment in an attempt to escape.  Once officers jumped the fence and made their way down the embankment, Decedent again refused to obey multiple commands given by the officers in both English and Spanish, immediately tensed his body, moved his arms to a position that prevented the Individual Officers from handcuffing him, and otherwise fought the Individual Officers' attempts to handcuff him.  At all times during the encounter, Decedent engaged the Individual Officers in a physical confrontation and actively resisted the Individual Officers, who did not know if Decedent was armed until he was handcuffed and hobbled.  In addition, Decedent's resistence escalated throughout the incident and included grabbing the handcuffs and refusing to let go once they were attached to his left wrist, rolling, bucking, and attempting to kick the Individual Officers.  During the incident, the Individual Officers never placed their full body weight on Decedent, and although Decedent was able to speak, he never stated that he was having trouble breathing or in any form of distress.  In addition, although Decedent was grunting from physical exertion, he never made any noises, such as wheezing or gurgling, that would alert the Individual Officers that Decedent was in any type of respiratory or other type of distress.  Moreover, the Individual Officers moved Decedent from a prone position to his left side as soon as he was handcuffed and hobbled.  Therefore, the Court concludes that, under the second step of the *Saucier* qualified immunity analysis, a reasonable officer in the Individual Officers' position would not have known that the controlling force used in this case violated a clearly established right.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that the Individual Officers reasonably could have believed that their conduct was lawful under the circumstances.  *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, the Individual Officers are entitled to qualified immunity on Decedent's Fourth Amendment claim with respect to the use of controlling force.  Accordingly, the Motion is granted with respect to Plaintiffs' first cause of action alleging a violation of Decedent's Fourth Amendment rights to the extent it is based on the use of controlling force.

### 2.    The Individual Officers Did Not Violate Clearly Established Law With Their Use of the TASER

In their Motion, the Individual Officers argue that the four TASER deployments by Moser were reasonable in light of the nature and extent of Decedent's active resistence, and noting that the TASER failed to immobilize Decedent long enough for the Individual Officers to handcuff him. In their Opposition, Plaintiffs argue that any use of the TASER on Decedent was excessive.[10]  In

---

[10]  Although the Court has considered the various LAPD Policies submitted by Plaintiffs (including LAPD Policies on the use of TASERs, the use of less lethal force, and excited delirium, such policies are "not dispositive" on either the question of whether a particular use of force is objectionably reasonable or if reasonable officers would have been on notice that it was clearly established that the force employed was objectionably unreasonable.  *Drumond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003); *see, e.g., Price*, 990 F.Supp. at 1238 (holding that deputies were entitled to qualified immunity where duty of peace officers to personally

Initials of Deputy Clerk _sr_

the Ninth Circuit, it is well-settled that TASERs, "when used in dart-mode constitute an intermediate, significant level of force that must be justified by the governmental interest involved."[11]  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  In addition, the Ninth Circuit has held that the use of a TASER on an individual who is only passively resisting is unreasonable.  *See, e.g., Bryan*, 630 F.3d at 826 (holding that dart mode TASER use unreasonable on a passively resisting suspect who was standing still); *Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016) (holding that TASER use unreasonable on a suspect passively resisting unlawful frisk); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013) (holding that TASER use on a person who committed "no act of resistence" was unreasonable); *Mattos v. Argarano*, 661 F.3d 433 (9th Cir. 2011) (holding TASER use unreasonable when it was used on a pregnant driver for not exiting her vehicle during a traffic stop and when it was used on a domestic violence victim who momentarily brushed aside an officer's hand as it touched her chest).  On the other hand, in *Marquez v. Phoenix*, 693 F.3d 1167 (9th Cir. 2012), the Ninth Circuit affirmed the use of a TASER against an individual who was physically resisting and "actively struggling" against the officers.  Similarly, in *Jones v. Las Vegas Metro Police Dep't*, 873 F.3d 1123 (9th Cir. 2017), the Ninth Circuit affirmed the initial use of a TASER against an individual who was actively resisting by running away from a traffic stop.  However, the Ninth Circuit found that once the individual was on the ground and "making no threatening sounds or gestures," the repeated and prolonged use of a TASER was unreasonable.  *Id*.

Although Decedent, a burglary suspect who may have been armed, aggressively and forcefully resisted the Individual Officers' efforts to handcuff him and take him into custody, including an attempt to kick the Individual Officers, the LABOPC concluded that Decedent's resistance did not amount to "violently resisting arrest" and did not pose "an immediate threat of violence or physical harm" to the Individual Officers justifying the use of a TASER.  In addition, LABOPC concluded that Moser failed to give a warning to Decedent that the TASER could injure him.  As a result, the LABOPC found Moser's use of the TASER to be Out of Policy.  The Court questions the findings of the LABOPC and notes that Chief Moore initially found Moser's use of the TASER to be In Policy before changing his decision to conform with the LABOPC's Findings.  However, based on this record, there may be sufficient evidence for a jury to conclude that Decedent's Fourth Amendment rights were violated by the use of the TASER.

However, even if Moser's use of the TASER could be considered excessive force, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that the Individual Officers are entitled to qualified immunity because it was not clearly established that Moser's use of the

---

administer CPR not clearly established, even though deputies had received CPR training, but none administered CPR to the decedent).  Instead, "[f]or a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  *Shafer*, 868 F.3d st 1117; *see, also, White*, 137 S.Ct. 548 ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment.  Instead, the majority relied on *Graham*, *Garner*, and their Court of Appeals progeny, which – as noted above – lay out excessive-force principles at only a general level").

---

[11]  The initial use of the TASER was in dart mode.

Initials of Deputy Clerk  _sr_

TASER under these particular circumstances would be a violation of Decedent's Fourth Amendment rights.[12]  In *A.B. v. County of San Diego*, 2020 WL 5847551 (S.D. Cal. Oct. 1, 2020), deputies responded to a store in response to reports of a disoriented man acting strangely.  The first deputy attempted to place the man in handcuffs, but he pulled away, and resisted the deputy's attempts to keep him on the ground.  *Id.*  A second deputy arrived, gave the man a verbal warning of TASER use, and deployed the TASER, and the man then ran into the parking lot.  *Id.*  After two more ineffective TASER deployments and a takedown, the man attempted to get up, and the deputies and civilians physically struggled with him.  *Id.*  Deputies were eventually able to place handcuffs on one of the man's wrists.  One of the deputies then struck the man on the hand, head, and shoulders with four hammer fist strikes, and six strikes with a sap.[13]  *Id.*  Additional deputies then assisted, applying downward pressure on the man to control his movements.  *Id.*  The deputies eventually placed the man in handcuffs and "maximum" leg restraints.  *Id.*  The man stopped moving and the deputies placed him on his side.  *Id.*  The man's breathing eventually became shallow and his pulse weakened, and he died in the ambulance.  *Id.*  In concluding that the deputies were entitled to qualified immunity, the district court concluded that after "exhaustively survey[ing] the controlling case law at the time of the events in question," "it would not have been apparent to a deputy facing similar circumstances that using a Taser on an individual suspected to be under the influence, actively resisting detention, engaged in a physical confrontation with a deputy, and then attempting to flee, constituted excessive force."  *Id.* ("Even if Deputies Garza's and Robledo's use of Tasers could be considered excessive force, its unconstitutionality is not 'beyond debate'").

Similarly, in this case, the Court concludes that, from the Individual Officers' perspective and knowledge of the circumstances in this case, Decedent, who appeared to be under the influence of drugs or alcohol, had been seen attempting to break in to multiple residences and vandalizing property in the area, refused to obey officers' commands throughout the entire incident, including initially refusing to get on the ground when instructed to do so, and instead ran away from officers, jumped a fence, and attempted to escape by going down an embankment.  Once officers jumped the fence in pursuant of Decedent and made their way down the embankment, Decedent again refused to obey the officers' multiple commands in both English and Spanish.  Decedent engaged the Individual Officers in a physical confrontation and resisted their attempts to place him in handcuffs, Decedent immediately tensed his body and moved his arms to a position to prevent the Individual Officers from handcuffing him.  Decedent continued battling with the Individual Officers, who did not know if Decedent was armed, throughout the entire incident, until after he was handcuffed and hobbled.  In addition, Decedent's resistence escalated throughout the incident and included grabbing the handcuffs and refusing to let go once they were attached to one of his wrist, rolling, bucking, and attempting to kick the Individual Officers.  Indeed, although the LABOPC ultimately concluded that Decedent's resistance was not "violent," it even acknowledged that Decedent "displayed a high level of resistance by utilizing his strength to prevent the officers from handcuffing him and by refusing to submit to an arrest."  In addition, the fact that Chief Moore initially concluded that Moser's decision to use the TASER was In Policy before ultimately adopting

---

[12]  Although Moser was the only officer who used his TASER, Plaintiffs have alleged that all of the Individual Officers are responsible because they failed to prevent Moser from using the TASER.

[13]  A sap is a leather impact weapon weighted with lead.

the LABOPC's conclusion that it was Out of Policy demonstrates that Moser's use of the TASER in this situation was a very close call and clearly demonstrates how a reasonable officer in this situation could conclude that the use of the TASER was reasonable.  Therefore, the Court concludes that, under the second step of the *Saucier* qualified immunity analysis, a reasonable officer in the Individual Officers' position would not have known that the use of the TASER in this case violated a clearly established right.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that the Individual Officers reasonably could have believed that their conduct was lawful under the circumstances.  *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, the Individual Officers are entitled to qualified immunity on Decedent's Fourth Amendment claim with respect to the use of the TASER.  Accordingly, the Motion is granted with respect to Plaintiffs' first cause of action alleging a violation of Decedent's Fourth Amendment rights with respect to the use of the TASER.

### 3. The Individual Officers Are Entitled to Qualified Immunity by Allowing Decedent to Roll into a Prone Position

#### a. The Individual Officers Did Not Violate Decedent's Fourth Amendment Rights by Allowing Decent to Roll into a Prone Position

In their Motion, the Individual Officers also argue that allowing Decedent, who on his own volition and without any contact by or help from the Individual Officers, to roll into a prone position and remain in a prone position for two and one-half minutes is not a violation of Decedent's Fourth Amendment rights.  In their Opposition, Plaintiffs argue that, relying on *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) and *Garlick v. County of Kern*, 167 F.Supp. 3d 1117 (E.D. Cal. 2016), "forcing" Decedent to remain in a prone position violated Decedent's Fourth Amendment rights.  However, the Ninth Circuit in *Tatum*, 441 F.3d at 1098, concluded that "it was objectively reasonable to position [the decedent] on his stomach for approximately ninety seconds under the circumstances of his arrest" and stated that "Tatum has not cited any authority to support her argument that simply laying a suspect on his stomach can constitute excessive force, and we have found none."

In this case, Decedent was not "forced" into a prone position.  After Decedent was handcuffed and hobbled, the Individual Officers immediately placed Decedent on his left side and held him there for approximately fifty-two seconds.  However, Decedent continued to move his hips and twist away from the Individual Officers until he was able, without any contact or help by the Individual Officers, turn onto his front in a semi-prone position, with his right hip raised from the ground and his left hand under his midsection.  According to Romero, although he tried, he was unable to roll Decedent back to his left side due in part to Decedent's resistance.  According to Beckstrom, after Decedent voluntarily rolled onto his stomach, Decedent was not placed back on his left side because he would continually roll onto his stomach and because once Decedent was on his stomach, Decedent seemed to calm down.  In addition, while Decedent was on his stomach,

Initials of Deputy Clerk __sr__

he was talking and he never appeared to be in any distress.  Although some of the Individual Officers placed a hand or a knee against Decedent to provide a barrier to prevent Decedent from rolling over, none of the Individual Officers placed their body weight on Decedent.  Moreover, throughout the two minutes and thirty-five seconds that Decedent was in a prone position, the Individual Officers repeatedly checked on Decedent's condition, spoke with Decedent in a calm tone and manner, and checked with dispatch as to the arrival time of the RA that had previously been called by the Flight Officer.

Therefore, viewing the facts in the light most favorable to Plaintiffs, the Court concludes that the Individual Officers did not violate Decedent's Fourth Amendment rights by allowing him to roll on his own into a prone position.[14]  Accordingly, the Motion is granted with respect to Plaintiffs' first cause of action alleging a violation of Decedent's Fourth Amendment rights to the extent it is based on the Individual Officers' allowing Decedent to roll into a prone position.

**b.      The Individual Officers Did Not Violate Clearly Established Law by Allowing Decedent to Roll into a Prone Position**

Because the Court concludes that Decedent's Fourth Amendment rights were not violated by the Individual Officers by allowing Decedent to roll into a prone position, the Court need not reach the second step of the *Saucier* analysis.  *See, e.g., Johnson v. County of Los Angeles*, 340 F.3d 787, 793-94 (9th Cir. 2003).  However, even assuming that the Court had found that the Individual Officers' conduct in allowing Decedent to roll into and remain in a prone position constituted a constitutional violation, the Individual Officers would still be entitled to summary judgment on Plaintiffs' claim that Decedent's Fourth Amendment rights were violated on the grounds of qualified immunity.

In this case, viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that Individual Officers are entitled to qualified immunity because it was not clearly established that the conduct of the Individual Officers of allowing Decedent to roll into a prone position without any contact or help by the Individual Officers and allowing Decedent to remain in a prone position under these circumstances would be a violation of Decedent's Fourth Amendment rights.  From the Individual Officers' perspective and knowledge of the situation, Decedent continued to resist officer by trying to roll onto his stomach even after he was handcuffed, hobbled, and placed on his left side.  The Individual Officers held Decedent on his left side for approximately fifty-two seconds, but thereafter, Decedent voluntarily rolled onto his stomach where he appeared calm.  Because the Individual Officers were concerned that Decedent's refusal to stop struggling posed a possible threat to them and to Decedent, the Individual Officers concluded that keeping Decedent in a prone position until the RA arrived was preferable to any other position.  In addition, the Individual Officers continued to monitor Decedent's condition throughout the two minutes and thirty-five seconds he was in a prone position, and there was no indication of any respiratory or other type of distress.  Therefore, the Court concludes that, under the second step of the *Saucier* qualified immunity analysis, a reasonable officer in the Individual Officers' position would not have

---

[14]  Although the LABOPC determined that the Individual Officers allowing Decedent to roll into a prone position was Out of Policy, that finding is not dispositive, particularly in light of the Ninth Circuit's holding in *Tatum* that officers laying an individual on his stomach for ninety seconds does not constitute excessive force.

Initials of Deputy Clerk _sr_

known that allowing Decedent to voluntarily roll into a prone position and stay in a prone position in this case violated a clearly established right.

In addition, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and the Court finds that the Individual Officers reasonably could have believed that their conduct was lawful under the circumstances.  *Id.*; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Therefore, the Individual Officers are entitled to qualified immunity on Decedent's Fourth Amendment claim with respect to the Individual Officers allowing Decedent to roll into a prone position.  Accordingly, the Motion is granted with respect to Plaintiffs' first cause of action alleging a violation of Decedent's Fourth Amendment rights to the extent it is based on the Individual Officers allowing Decedent to roll in to a prone position.

### C.    Plaintiffs' Fourteenth Amendment Right to Familial Association Claim

In this case, because the Court has concluded that the Individual Officers are entitled to summary judgment in their favor on Decedent's Fourth Amendment excessive force claim alleged the first cause of action, the Individual Officers are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claims alleged in the second and fourth cause of action because there is no underlying constitutional violation to support the Fourteenth Amendment right to familial association claim and, even if there is an underlying constitutional violation, the Individual Officers are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claims for the same reasons that they are entitled to qualified immunity on Decedent's Fourth Amendment claim.  *See, e.g., Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail*, 628 F. App'x 527, 528 (9th Cir. 2016) ("Recovery for a violation of the right to familial association is generally contingent on the existence of an underlying constitutional violation."); *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004) ("Since the claim of familial interference is directly related to all the other constitutional claims . . ., the other claims form an integral part of the claim relating to familial interference.").

Therefore, the Individual Officers are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claims.  Accordingly, the Motion is granted with respect to Plaintiffs' second and fourth causes of action alleging a violation of Plaintiffs' Fourteenth Amendment rights.

## IV.    Conclusion

For all the foregoing reasons, the Individual Officers' Motion is **GRANTED in part and DENIED in part**.  The Individual Officers' Motion is granted with respect to Plaintiffs' first, second, and fourth causes of action.  The Individual Officers' Motion is **DENIED without prejudice** as to Plaintiffs state law claims.

IT IS SO ORDERED.

Initials of Deputy Clerk __sr__